# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 21-755V

| | |
|---|---|
| JOHN PRYOR,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: August 19, 2025 |

*Sean Franks Greenwood*, The Greenwood Law Firm, Houston, TX, for Petitioner.

*Felicia Langel*, U.S. Department of Justice, Washington, DC, for Respondent.

**RULING ON ENTITLMENT**[1]

On January 15, 2021, John Pryor filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges a Table injury - that he suffered a shoulder injury related to vaccine administration ("SIRVA") after receiving an influenza ("flu") vaccine on December 2, 2019. Petition at 1, ¶ 1, (ECF No.1); Amended Petition at 1, ¶ 1, (ECF No.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Ruling will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

29). The case was assigned to the Special Processing Unit of the Office of Special Masters.

After a full review of the evidence, and for the reasons discussed below, I find that Petitioner has established by preponderant evidence all requirements for a SIRVA Table injury and is otherwise entitled to compensation for his injury.

## I. Relevant Procedural History

On June 30, 2023, Respondent filed his Rule 4(c) Report defending this claim and recommending that compensation be denied. ECF No. 33. Respondent argues that Petitioner has failed to demonstrate that he "suffered the residual effects or complications" of his alleged SIRVA injury "for more than 6 months after the administration of [his flu] vaccine" as required under Section 11(c)(1)(D)(i) of the Act. *Id.* at 4-5. Additionally, Respondent argues that the evidence preponderates against a finding that the onset of Petitioner's shoulder pain occurred within 48 hours of his vaccination as required to establish a SIRVA Table injury. *Id.* at 5-6.

I subsequently set deadlines for the filing of briefs addressing the contested issues (as well as Petitioner's success in meeting the other SIRVA elements). On September 1, 2023, Petitioner filed a Motion for a Ruling on the Record. ECF No. 35. Petitioner argues that he has established that he suffered the residual effects of his SIRVA injury for more than six months (the "severity" requirement), demonstrated that he suffered the onset of his shoulder pain within 48 hours of his flu vaccine and otherwise established entitlement to compensation for his SIRVA injury. *Id.* Respondent reacted to Petitioner's brief on September 14, 2023, maintaining that this claim must be dismissed and compensation denied for the same reasons set forth in his Rule 4 Report. ECF No. 36.

This matter is ripe for my resolution.

## II. Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in

the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

---

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. Section 11(c)(1)(A)(B)(D)(E).

>   (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
>   (ii) Pain occurs within the specified time-frame;
>
>   (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
>   (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

## III. Relevant Factual Evidence

I have fully reviewed the evidence, including all medical records declarations, and the parties' briefing. I find most relevant the following:

### A. Medical Records

- On December 2, 2019, Petitioner received the flu vaccine in his left deltoid at a CVS MinuteClinic. Ex. 12 at 3-4.

- On December 26, 2019 (now 24 days after his vaccination), Petitioner was seen by endocrinologist Bridget Brady, M.D., for a chief complaint of hyperparathyroidism. Ex. 9 at 5. Petitioner's musculoskeletal examination at that visit found "normal strength and range of motion in all major muscle groups." *Id.* at 8. Petitioner was assessed by Dr. Brady with primary hyperparathyroidism, parathyroid adenoma, kidney stones, and borderline hypertension. *Id.* Dr. Brady recommended Petitioner undergo a minimally invasive parathyroidectomy. *Id.* The record provides no report of shoulder pain or limitations at this appointment.

- On February 7, 2020, Petitioner underwent a parathyroidectomy by Dr. Brady. Ex. 9 at 13-14.

- On February 19, 2020, Petitioner had a follow-up appointment with Dr. Brady for a post-operative check. Ex. 9 at 15-18. The record provides no report of shoulder pain or limitations at this appointment.

- On February 27, 2020, nearly three months (or approximately 87 days post-vaccination), Petitioner established care with primary care physician, David Murdy, M.D. Ex. 4 at 10. Petitioner's chief complaints at this appointment included: "Shoulder Pain (12/3/19 p[atien]t states he thinks it was from a flu shot at Minute Clinic)." *Id.* at 10, 12. Petitioner reported that he "took some NSAIDs but [his pain was] not relieved." *Id.* at 12. It was noted that he had "limited" range of motion in the left arm "at times" and that he had "[l]imited motion forward but not laterally." *Id.* at 12. On musculoskeletal examination, Petitioner's "[f]orward motion [was] limited at 90 degrees." *Id.* at 14. Petitioner was assessed with an "[a]rthropathy of left shoulder," prescribed a nonsteroidal anti-inflammatory drug ("NSAID") daily for one to two months, and advised to consider an orthopedist for which a referral was provided. *Id*. at 14-15, 34. Petitioner was also provided shoulder range of motion exercises. *Id.* at 31-33.

- On March 3, 2020, Petitioner had a follow-up appointment with psychiatrist Timothy Sheehan, M.D. Ex. 3 at 12. Petitioner reported that he was "doing well" and had "overall been feeling fine since surgery." *Id.* There was no discussion of Petitioner's shoulder pain in this record.

- On May 11, 2020, over five months post-vaccination, Petitioner was evaluated by orthopedist, Donavan Murphy, M.D., for complaints of "left shoulder pain" that "ha[d] been present for approximately six months." Ex. 13 at 10-11. Petitioner informed Dr. Murphy that "the pain began right after he had a flu shot and fe[lt] that may have been the cause." *Id* at 11. Petitioner rated "the pain as 3/10 and describe[d] it as sharp and aching but also at times c[ould] get up to as high as 8/10." *Id.* Petitioner stated that he "tried a shoulder home exercise program as well as Advil and meloxicam with minimal relief." *Id.* Dr. Murphy reviewed a shoulder x-ray taken that same day and noted "[m]ild acromioclavicular hypertrophy with type 3 acromion." *Id.* at 13, 34. Dr. Murphy assessed Petitioner with a "left shoulder internal derangement concerning for superior labral tear and left shoulder subacromial impingement." *Id.* at 14. Dr. Murphy stated he thought "the superior labrum [wa]s more symptomatic" that day. *Id.* A review of treatment options was discussed, and Petitioner elected to proceed with a steroid injection (which was administered that day) and a shoulder home exercise program. *Id.* at 14.

6

- On June 3, 2020, Petitioner had a follow-up telemedicine appointment with Dr. Sheehan. Ex. 3 at 10. The record contains no discussion of Petitioner's shoulder pain at this appointment.

No further medical records have been filed.

### B. Affidavit

Petitioner executed a notarized affidavit on January 13, 2021, addressing his December 2, 2019 vaccination and shoulder injury. Ex. 1 at 1-4. Petitioner states he received the flu vaccination in his left shoulder "[o]n or around December 2, 2019," at a CVS Minute Clinic. *Id* at 1. Petitioner recounts that the vaccine was "administered very high on my left arm and I felt discomfort immediately." *Id.* He recalls the "pain reached an intense level within 5 hours of the injection." *Id.* Petitioner states he began "experiencing increased pain, weakness, and limited range of motion in my left arm." *Id.* Petitioner states that did not notify pharmacist of his pain "at the time of the injection", however he states that he did discuss it with others including "family members, work colleagues, [his] children's pediatrician, and [his] psychiatrist." *Id.* at 2.

Petitioner explains his pain persisted from December 2019 through January 2020, but states that he thought that the pain would "subside and decided to wait to contact my primary care physician to provide more time for healing." *Id.* at 2. In early February 2020, Petitioner recalls that his pain had progressed and he made an appointment with a physician. *Id.* Petitioner recounts seeing Dr. Murdy regarding his left shoulder on February 27, 2020,[4] and states that he also discussed "the effects of the pain and limitations to [his] movement on [his] mental health" with Dr. Sheehan on March 3, 2020. *Id.*

Petitioner also discusses his May 11, 2020,[5] appointment with Dr. Murphy who Petitioner states "concluded that the pain I was experiencing was due to an injury that occurred during the vaccine administration." *Id.* at 3. Petitioner states Dr. Murphy "administered a steroid shot to into the joint of my left shoulder to reduce inflammation" and recommended at home physical therapy. *Id.* Petitioner states that Dr. Murphy discussed with him that he might potentially require surgery if there was no relief in the future. *Id.*

---

[4] Petitioner inadvertently states the date of this appointment was on or around February 27, 2019 which is a typographical error as the appointment occurred on February 27, 2020.

[5] Petitioner inadvertently states the date of this appointment was on or around May 11, 2019 which is a typographical error as the appointment occurred on May 11, 2020.

Petitioner avers that he began home physical therapy on approximately May 14, 2020[6] and continued his use of over-the-counter pain relievers. *Id.* Petitioner recalls that he also continued to see Dr. Sheehan and discussed with him how the injury was impacting his mental health. *Id*. at 3. Petitioner maintains that he was not able to initially pursue additional treatment due to covid-19 pandemic related closures, and that after facilities reopened, he "was scared to risk exposure" and continued his home physical therapy and taking over-the-counter medications. *Id.* Petitioner maintains that his shoulder symptoms persisted for more than six months and continued through the date of his affidavit. *Id.* at 4.

Finally, Petitioner describes the limitations that he suffered in his daily activities due to his shoulder pain. *Id.*

## IV. Findings of Fact

### A. Severity

The preliminary issue to be determined in this case is whether Petitioner has satisfied the Vaccine Act's "severity requirement," pursuant to which a petitioner demonstrate that they:

> (i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.

Section 11(c)(1)(D). To do so here, Petitioner would need to establish sequelae from his alleged persisted until at least SIRVA at least June 3, 2020 (assuming an onset of December 2, 2019).

After a careful review of the record, I find that Petitioner has established that he more likely than not suffered the sequela of his injury for more than six months. Petitioner's last medical visit was with orthopedist Dr. Murphy on May 11, 2020 – five months and nine days, or 161 days, after vaccine administration. At that appointment, Petitioner continued to report left shoulder pain, which he rated as 3/10, but going up to as high as 8/10." Ex. 13 at 11. He noted the pain particularly at night when he was "trying to sleep. *Id.* While Petitioner's left range of motion and strength were not diminished on

---

[6] Petitioner actually states he began his home therapy on May 14, 2019, but again it is evident this is a typographical error.

May 11, 2020, he was found on examination to have a positive O'Brien's and Neer test. *Id.* at 13. Dr. Murphy assessed Petitioner with a "left shoulder internal derangement concerning for superior labral tear and left shoulder subacromial impingement." *Id.* at 14. Finally, after discussing treatment options with Dr. Murphy, Petitioner choose to undergo a steroid injection and engage in home physical therapy. *Id.*

I find that based on the nature of Petitioner's left shoulder symptoms and treatment on May 11, 2020, Petitioner's shoulder symptoms and/or shoulder pain likely persisted an additional 23 days thereafter, or until *at least* June 3, 2020. Additionally, the discussion in Dr. Murphy's May 11, 2020 medical record regarding Petitioner's decision (after considering different treatment options) to receive a steroid injection that day and then pursue a home exercise program is consistent with Petitioner's affidavit testimony that he subsequently engaged in at-home physical therapy. Ex. 13 at 14; Ex. 1 at 3.

I acknowledge that Petitioner did seek some treatment for his shoulder during the Covid-19 Pandemic, and note that there is no record evidence that he subsequently tried and failed to obtain treatment due to the Pandemic[7] – although as Petitioner points out in his brief, such efforts would not necessarily be documented in a provider's records. ECF No. 35 at 9. Nonetheless, I accept Petitioner's affidavit testimony that Pandemic closures impacted his ability to obtain treatment, and that he later chose to continue at home physical therapy and the use of over-the-counter medications to treat his shoulder as he was "scared to risk exposure" to the Covid-19 virus. Ex. 1 at 3. However, the fact that Petitioner did not seek additional in-person treatment, or even alternatively seek treatment by video or telephone appointment (as he did with his psychiatrist Dr. Sheehan), strongly suggests that his injury was relatively mild – a factor that I will take into account in any damages determination.

### B. Onset

The second disputed issue in this case is whether Petitioner's first post-vaccination symptom or manifestation of onset (specifically pain) of his shoulder injury occurred within 48 hours of his flu vaccination as set forth in the Vaccine Injury Table and Qualifications and Aids to Interpretation ("QAI") for a Table SIRVA. 42 C.F.R. § 100.3(a)(XIV)(B) (seasonal influenza vaccines); 42 C.F.R. § 100.3(c)(10)(ii) (required onset for pain listed in the QAI). Based upon a review of the entire record, and for the reasons set forth below, I find that it more likely than not did.

---

[7] Petitioner also maintains that he discussed his shoulder injury with his psychiatrist during this time period – however, Dr, Sheehan's records fail to document any discussion of Petitioner's shoulder injury or concerns. Ex. 1 at 2-3. *See* Ex. 3.

In this case, as correctly pointed out by Respondent, the records corresponding to Petitioner's first several encounters with medical providers following his December 2, 2019 vaccination contain no reference to Petitioner's shoulder pain at all. But these encounters all involve endocrinology treatment to address Petitioner's hyperparathyroidism (including a surgical procedure – a parathyroidectomy). As I have observed in other cases, it would not be uncommon for either a patient to fail to report, or for a provider to fail to document, symptoms outside the primary purpose of a medical visit – as would be the case for Petitioner's medical encounters regarding his hyperparathyroidism.

Additionally, the fact that references to onset in a medical record are not precise in terms of time or date does not prevent a favorable finding. As I have previously observed, "the Vaccine Act clearly does *not* require that symptoms be recorded within a specific timeframe to be preponderantly established. Rather, it requires only that onset *occurs* in the relevant timeframe." *Niemi v. Sec'y of Health & Hum. Servs.,* No. 19-1535V, 2021 WL 4146940, at *4 (Fed. Cl. Aug. 10, 2021) (citing Section 13) (emphasis in original). Neither does the Act require that the medical records document an exact date that the onset of a petitioner's shoulder pain began. A special master may thus find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2).

In this case, Petitioner's allegation that his shoulder pain occurred within 48 hours of his vaccination is supported by contemporaneous treatment records (even if the medical records *most* contemporaneous to his December 2, 2019 vaccination do not). In particular, the records corresponding to February 27, 2020 appointment with Dr. Murdy for his shoulder pain – which occurred just under three months after his vaccination – document that Petitioner suffered pain and limited range of motion in his left shoulder following his flu vaccination. Ex. 4 at 10, 12. That record specifically provides: "Shoulder Pain (12/3/19[8] p[atien]t states he thinks it was from a flu shot at Minute Clinic." *Id.* Thereafter, Petitioner reported on May 11, 2020 to Dr. Murphy that his shoulder "pain began right after he had a flu shot and fe[lt] that may have been the cause." Ex. 13 at 11.

Based on the record as a whole, and as discussed above, I find that Petitioner has established the onset of his injury occurred within 48 hours of his vaccination. Of course,

---

[8] I observe that Petitioner received his flu vaccination on December 2, 2019 – thus, the reference to December 3, 2019 appears to be either a typographical error in the medical record, or a mistake Petitioner made in reporting the date of his vaccination to Dr. Murdy – nonetheless, I find it evident that Petitioner reported to Dr. Murdy that his shoulder pain began the date of his vaccination at the Minute Clinic.

10

Petitioner's reasonably short delay in seeking medical treatment specific to his shoulder pain demonstrates that he was able to tolerate the pain initially, and (like his decision not to pursue further in-person treatment after May 11, 2020) is indicative of a less severe SIRVA – a factor I will consider in awarding damages for pain and suffering in this case.

### C.     Other Table Requirements and Entitlement

Petitioner has established all other requirements for a Table SIRVA claim. 42 C.F.R. § 100.3(c)(10). There is no history of shoulder pain, inflammation, or dysfunction that would explain the post-vaccination injury. 42 C.F.R. § 100.3(c)(10)(i). Petitioner's pain and reduced range of motion were limited to the shoulder in which the intramuscular flu vaccine was administered. 42 C.F.R. § 100.3(c)(10)(iii). And there is not preponderant evidence of another condition that would explain the symptoms. 42 C.F.R. § 100.3(c)(10)(iv). However, even if a petitioner has satisfied the requirements of a Table injury or established causation-in-fact, he or she must also provide preponderant evidence of the additional requirements of Section 11(c), *i.e.*, receipt of a covered vaccine, residual effects of injury lasting six months, *etc*. *See generally* Section 11(c)(1)(A)(B)(D)(E). But those elements are established or undisputed in this claim. I therefore find that Petitioner is entitled to compensation in this case.

### Conclusion

Based on the entire record, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation. A Damages Order will issue.

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master